[Cite as *In re W.R.*, 2025-Ohio-2716.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF: W.R.

JUDGES:
Hon. William B. Hoffman, P.J.
Hon. Andrew J. King, J.
Hon. David M. Gormley, J.

Case No. 2024CA00208

O P I N I O N

CHARACTER OF PROCEEDINGS:     Appeal from the Stark County Court of Common Pleas, Family Court Division, Case No. 2023JCV00499

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     August 1, 2025

APPEARANCES:

For Appellee

JAMES B. PHILLIPS
QUAY DIANE COMPTON
Stark County Job and Family Services
221 3rd Street, S.E.
Canton, Ohio 44702

For Appellant

RICHARD D. HIXSON
3808 James Court, Suite 2
Zanesville, Ohio 43701

Guardian ad Litem

MARY LOU SEKULA
P.O. Box 129
Louisville, Ohio 44641

*Hoffman, P.J.*

{¶1}    Appellant A.K. ("Mother") appeals the December 10, 2024 Judgment Entry, the December 10, 2024 Findings of Fact and Conclusions of Law, and the December 10, 2024 Certificate of Permanent Legal Custody entered by the Stark County Court of Common Pleas, Family Court Division, which terminated her parental rights, privileges, and responsibilities with respect to her minor child ("the Child") and granted permanent custody of the Child to appellee Stark County Department of Job and Family Services ("SCJFS").[1]

STATEMENT OF THE CASE AND FACTS

{¶2}    Mother and W.R. ("Father") are the biological parents of the Child.[2] The Child was born with achondroplasia[3] and bronchopulmonary dysplasia.[4]  On May 3, 2023, SCJFS filed a complaint alleging the Child was dependent, neglected, and/or abused, after SCJFS learned the Child had been admitted to Akron Children's Hospital on May 2, 2023, for injuries which were determined to be non-accidental trauma, to wit: bilateral subdural bleeding and retinal hemorrhaging. Father was ultimately identified as the perpetrator of the abuse, and was convicted and sentenced on one count of child endangering in September, 2024. The trial court conducted an emergency shelter care

---

[1] On December 23, 2024, the trial court issued a Judgment Entry Nunc Pro Tunc as of December 10, 2024, Findings of Fact and Conclusions of Law Nunc Pro Tunc as of December 10, 2024, and Certificate of Permanent Legal Custody Nunc Pro Tunc as of December 10, 2024, to correct the Child's date of birth.

[2] Father is not a party to this appeal.

[3] "Achondroplasia is a bone growth disorder that results in dwarfism." https://my.clevelandclinic.org/health/diseases/22183-achondroplasia (accessed July 10, 2025).

[4] "Bronchopulmonary dysplasia, or BPD, is a serious lung condition that affects mostly babies who are born more than 10 weeks before their due date, weigh less than two and a half pounds, have breathing problems at birth and need long-term breathing support and oxygen." https://www.hopkinsmedicine.org/health/conditions-and-diseases/bronchopulmonary-dysplasia (accessed July 10, 2025).

hearing on the same day, and placed the Child in the shelter care custody of SCJFS. The trial court appointed Attorney Mary Lou Sekula as guardian ad litem ("GAL") for the Child.

{¶3} At the adjudicatory hearing on July 6, 2023, Mother and Father stipulated to a finding of abuse and the trial court found the Child to be abused. SCJFS deleted the allegations of dependency and neglect. The trial court proceeded to disposition and granted temporary custody of the Child to SCJFS. The trial court conducted a review hearing on November 2, 2023, and maintained the status quo. The trial court conducted a dispositional review hearing on April 2, 2024, and found there were no compelling reasons to preclude a request for permanent custody to SCJFS. On the same day, SCJFS filed a motion for permanent custody. The trial court scheduled a hearing on the motion for permanent custody for July 22, 2024. Mother and Father filed motions to extend temporary custody on July 15, 2024, and July 19, 2024, respectively. The trial court conducted a hearing on Mother and Father's motions on July 22, 2024, and extended temporary custody until November 3, 2024.

{¶4} SCJFS filed a second motion for permanent custody on July 26, 2024. The trial court scheduled a hearing on the motion for November 4, 2024.

{¶5} On the day of the hearing, Father, who was incarcerated at the Lorain Correctional Institution, appeared via Zoom. The trial court explained to Father the nature and consequences of the motion for permanent custody. The trial court also informed Father of his rights. Thereafter, Father stipulated to the granting of permanent custody of the Child to SCJFS.

{¶6} At the hearing, Michael Stranathan, a psychology assistant at Summit Psychological Associates, testified he conducted a psychological evaluation of Mother.

Mother completed the Minnesota Multiphasic Personality Inventory II ("MMPI"). The testing revealed Mother minimized the extent of the problems she experienced. Stranathan noted Mother exhibited symptoms of post-traumatic stress disorder and persistent depressive disorder. Mother acknowledged problems with chronic depression and anxiety, but was inconsistent with her mental health treatment, including counseling and taking prescribed medication.

{¶7} Stranathan discussed SCJFS's involvement with Mother. Mother indicated the Child had experienced projectile vomiting which had lasted several days. The Child had been diagnosed previously with some congenital health issues which were exacerbated by physical abuse. Mother was not forthcoming with the identity of the perpetrator. Stranathan explained this revealed Mother was not willing to accept responsibility for any of her own actions which resulted in the Child's injuries or she was protecting another individual; therefore, she was not able to protect the Child.

{¶8} Mother also completed the Parent Stress Index, Fourth Edition ("PSI"), which is a measure of a parent's perception of his/her relationship with his/her child. Mother responded with socially acceptable answers. The PSI revealed Mother would have difficulty addressing the Child's behaviors based upon the Child's mood or temperament. In other words, Mother would simply perceive the Child as being fussy, moody, and difficult. As a result, Mother would have difficulty maintaining a sense of calm with the Child, and would not be able to put aside her feelings and deal with the Child's behavior without becoming upset. In addition, Mother completed the self-report screening instrument ("SASSI"), which is used to determine whether an individual has a history of

problems with substance use, such as alcohol or drugs. Stranathan stated Mother showed no indications of substance use.

{¶9}   As a result of the testing, Stranathan recommended Mother complete a parenting class as well as an in-person American Red Cross first aid and CPR class; undergo a psychiatric evaluation; participate in individual counseling; abstain from drugs and alcohol and submit to random drug testing; and attend the Child's medical appointments and become involved with the Child's medical care.

{¶10} SCJFS ongoing family service worker Kimberly Gabel testified regarding the procedural history of the case including the circumstances which led to the initial removal of the Child from the home. Mother's case plan required her to complete a parenting assessment and follow all recommendations; complete a psychiatric assessment and follow all recommendations; complete the Goodwill Parenting skills training program; maintain stable housing and employment; and demonstrate the ability to meet the Child's basic needs.

{¶11} Mother completed her psychiatric assessment and was consistently taking her prescribed medication.  Mother attended weekly counseling at Wellness Grove. However, Gabel did not believe Mother's counseling was addressing the areas of concern.  Mother did not recognize her protective role to ensure the Child was safe in her care.  Despite Gabel having numerous conversations with Mother about addressing, in counseling, her unyielding commitment to Father and inability to separate herself from him for the sake of the Child, Mother stood by Father and supported him. Gabel found Mother's behavior deeply concerning. As Gabel explained, "Mother had the opportunity to maintain [the Child] in her home and she [sic] kick father out at the intake level through

a safety plan and mother refused. Mother had the opportunity to separate herself from father when he was incarcerated in March of 2024 and she still stood by him." Transcript of November 4, 2024 Hearing at p. 36. Mother had not been completely transparent with Gabel regarding Mother's ongoing relationship with Father. Gabel noted Mother had 300 phone calls with Father while he was incarcerated. Gabel expressed her belief Mother would not keep the Child away from Father when Father was released from prison.

{¶12} The Child has significant medical needs related to her congenital condition as well as the physical abuse she suffered. Mother did not follow the advice she received from medical professionals in order to properly care for the Child. Mother did not retain the information she observed and learned at the Child's medical and physical therapy appointments. Mother relied on the information she obtains from social media.

{¶13} Mother participated in the Goodwill Parenting program on two occasions. Mother did not complete the program the first time. Mother completed the program the second time, but received a certificate of non-compliance. Gabel was present during Mother's visits with the Child and noted there was no observable bond between Mother and the Child. Gabel opined Mother had gone through the motions, but had not changed her behavior or reduced the risks.

{¶14} Gabel also testified during the best interest portion of the hearing. The Child has several medical conditions, including achondroplasia and bronchial pulmonary dysphasia. The Child is involved in occupational therapy, physical therapy, and speech therapy. Gabel noted the Child's developmental milestones were adjusted due to her conditions. Gabel described the Child as stubborn, but very happy. The Child had "a wonderful attachment to her caregivers." Tr. at p. 84. The Child had been in the same

placement since May 4, 2023. The foster parents had created a stimulating environment to encourage the Child's overall development. The Child was bonded with the foster parents and they wished to adopt the Child.

{¶15} Gabel detailed Mother's visits with the Child. Mother did not have the ability to recognize the Child's medical needs. Mother spoke of the Child in negative terms. Mother did not engage in face-to-face interaction with the Child. Gabel did not observe a bond between Mother and the Child. Mother failed to recognize simple safety hazards. Gabel opined a grant of permanent custody was in the best interest of the Child. The Child needed to be safe, have her medical needs met, and be unconditionally loved. Gabel did not believe Mother could provide the Child with any of those things.

{¶16} The GAL filed ten (10) reports between May 18, 2023, and October 23, 2024. The GAL repeatedly recommended permanent custody of the Child be granted to SCJFS. The GAL addressed the trial court at the hearing. She stated the benefits of permanent custody outweighed the harm of breaking any bond which existed between the Child and Mother. The Child was doing well in foster placement and the foster parents wished to adopt the Child. The Child had a strong bond with the foster parents. The GAL noted the Child was "always happy" with the foster parents, but "cried the entire time" at visits with Mother. Tr. at p. 94. The GAL added Mother did not utilize the skills taught at Goodwill Parenting and did not engage the Child in the exercises learned during the Child's physical therapy. The GAL concluded permanent custody was in the Child's best interest.

{¶17} Via Judgment Entry filed December 10, 2024, the trial court terminated Mother's parental rights, privileges, and responsibilities. The trial court issued Findings

of Fact and Conclusions of Law on the same day. Therein, the trial court found the Child had been in the temporary custody of SCJFS for 12 or more months of a consecutive 22-month period. The trial court also found the Child could not be placed with Mother within a reasonable time and should not be placed with Mother. The trial court further found a grant of permanent custody to SCJFS was in the Child's best interest.

{¶18} It is from this judgment entry Mother appeals, raising the following assignments of error:

I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING THAT THE MINOR CHILD WAS IN THE TEMPORARY CUSTODY OF THE AGENCY FOR TWELVE OR MORE MONTHS OF A CONSECUTIVE TWENTY-TWO MONTH PERIOD, IN SATISFACTION OF R.C. 2151.414(B)(1)(d).

II. THE TRIAL COURT ERRED IN FINDING THAT [THE CHILD] "CANNOT BE PLACED WITH EITHER PARENT WITHIN A REASONABLE TIME NOR SHOULD THE CHILD BE PLACED WITH THEM."

III. THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF [THE CHILD].

{¶19} This case comes to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

I, II, III

{¶20} For ease of discussion, we shall address Mother's assignments of error together.

{¶21} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. (Citation omitted.) *In re D.R.*, 2024-Ohio-1819, ¶28 (5th Dist.). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.*, 54 Ohio St.2d 279, syllabus (1978).

{¶22} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long term foster care.

{¶23} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or

more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period.

{¶24} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶25} If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶26} In her first assignment of error, Mother challenges the trial court's finding the Child had been in the temporary custody of SCJFS for 12 or more months of a consecutive 22-month period.

{¶27} R.C. 2151.414(B)(1)(d) expressly authorizes the juvenile court to grant permanent custody of a child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d).

{¶28} The statute clarifies "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1).

{¶29} In *In re J.B.*, the Ninth District Court of Appeals considered "whether a children services agency, that has filed a motion for permanent custody that has not been disposed, may file a subsequent motion for permanent custody prior to the commencement of the permanent custody hearing, to allege the additional first-prong ground that the child has now been in the temporary custody of the agency for 12 or more months of a consecutive 22–month period, merely because of the passage of time." *In re J.B.*, 2018-Ohio-244, ¶ 10 (9th Dist.). The Ninth District held, "in these circumstances, the agency lacks authority to file a subsequent motion for permanent custody [alleging, for the first time, the 12 of 22 provision as grounds] when its prior motion for permanent custody remains pending and has not yet been disposed." *Id*.

{¶30} SCJFS filed its complaint on May 3, 2023. The Child was placed in the emergency temporary custody of SCJFS on the same day. The trial court adjudicated the Child abused on July 6, 2023. Pursuant to R.C. 2151.414(B)(1), the 12-month look back period began on July 2, 2023, sixty days after the Child's removal from the home. SCJFS filed an initial motion for permanent custody on April 2, 2024, prior to the Child having been in the SCJFS's custody for 12 months. This motion did not allege "12 of 22" grounds. The matter came on for hearing on the motion for permanent custody on July 22, 2024. However, the motion was not heard as the parties agreed to extend temporary custody until November 3, 2024. Thereafter, on July 26, 2024, SCJFS filed a second

motion for permanent custody alleging, for the first time, the additional first-prong ground the Child had been in the temporary custody of SCJFS for 12 or more months of a consecutive 22–month period.

{¶31} An agency may file a motion for permanent custody at any time alleging grounds enunciated in R.C. 2151.414(B)(1) or (2), as long as such grounds exist at the time the agency files its motion. *In re J.B.*, 2018-Ohio-244, at ¶ 15, citing *In re C.W.*, 2004-Ohio-6411, ¶ 27. "Unless the motion is withdrawn in good faith or otherwise disposed in a manner which does not terminate the case, * * * the agency is bound by the allegations in its original motion for permanent custody and may not further allege '12 of 22' grounds only because the passage of time due to continuances and other delays would otherwise support such grounds." *Id*.

{¶32} When SCJFS filed its original motion for permanent custody on April 2, 2024, the Child had not been in temporary custody for at least 12 months during the 22-month lookback period.  SCJFS's second motion for permanent custody did not supplant the first.  *Id*. at ¶ 17.  Accordingly, we find the trial court erred in finding the Child had been in the temporary custody for at least 12 or more months of a consecutive 22-month period.

{¶33} However, "[t]he five first-prong factors enumerated in R.C. 2151.414(B)(1)(a)-(e) are alternative findings [and an agency] must only prove one of those grounds in order to satisfy the first-prong requirement of the permanent custody test." (Citations omitted.) *Id*. at ¶ 9. The trial court also found the Child could not be placed with Mother and Father within a reasonable time nor should the Child be placed with them. Mother challenges this finding in her second assignment of error.

{¶34} Mother submits the finding is "mostly based on the idea that Mother is not capable of protecting the child * * * due to her relationship with" Father. Brief of Appellant at p. 14. Mother adds, "no evidence of Father's wrongdoings against [the Child] was presented beyond his conviction and the injuries suffered by [the Child]." *Id*. at p. 15. Mother concludes, "[a]s such, the question of whether Mother's actions were actually unreasonable in this situation cannot be thoroughly and accurately determined based on a review of the record." *Id*. We disagree.

{¶35} In addition to the extensive testimony presented at the permanent custody hearing establishing Mother stood by Father despite Father being convicted of child endangering, the record also shows Mother was unable or unwilling to work with medical professionals. When given the opportunity to engage the Child in the exercises not only recommended by physical therapists, but also necessary for the Child to gain strength and mobility, Mother did nothing. Mother placed the Child in a stroller rather than encouraging the use of a walker. Mother believed she knew more than the medical professionals, often relying on information she gathered on social media.

{¶36} Mother participated in the Goodwill Parenting program on two occasions. Mother did not complete the program the first time. Although Mother completed the program the second time, she received a certificate of non-compliance. Mother went through the motions, but had not changed her behavior or reduced the risks.

{¶37} Based upon the foregoing, we find there was sufficient and substantial competent evidence to support the trial court's finding the Child could not be placed with Mother within a reasonable time or should not be placed with her.

**{¶38}** Mother further asserts the trial court erred in finding permanent custody was in the Child's best interest. Mother submits "the trial court failed to adequately weigh the required best interest factors." Brief of Appellant at p. 23.

**{¶39}** We find there was clear and convincing evidence to support the trial court's best interest finding. The GAL stated the benefits of permanent custody outweighed the harm of breaking any bond which existed between the Child and Mother. The Child had a strong bond with the foster parents and the foster parents wished to adopt the Child. The GAL noted the Child was "always happy" with the foster parents, but "cried the entire time" at visits with Mother. Tr. at p. 94. The GAL added Mother did not utilize the skills taught at Goodwill Parenting and did not engage the Child in the exercises learned during the Child's physical therapy. The GAL concluded permanent custody was in the Child's best interest.

**{¶40}** The ongoing service worker, Kimberly Gabel, testified the Child had several medical conditions, including achondroplasia and bronchial pulmonary dysphasia. The Child was engaged in occupational therapy, physical therapy, and speech therapy. The Child had been in the same foster placement since May 4, 2023. The foster parents created a stimulating environment to encourage the Child's overall development. The Child was bonded with the foster parents and they wished to adopt the Child.

**{¶41}** Gabel testified regarding Mother's visits with the Child. Mother did not have the ability to recognize the Child's medical needs. Mother spoke of the Child in negative terms. Mother did not engage in face-to-face interaction with the Child. Gabel did not observe a bond between Mother and the Child. Mother failed to recognize simple safety hazards.

**{¶42}** Based upon the foregoing, we find the trial court did not err in finding permanent custody was in the Child's best interest.

**{¶43}** Mother's first assignment of error is sustained. Mother's second and third assignments of error are overruled.

**{¶44}** Although we disagree with the trial court's finding the Child had been in the temporary custody of SCJFS for 12 or months out of a consecutive 22-month period, our agreement with the trial court on all other issues - including the cannot-or-should-not-be-placed finding under R.C. 2151.414(B)(1)(a) - leads us to affirm the trial court's judgment awarding permanent custody of the Child to SCJFS.

**{¶45}** The judgment of the Stark County Court of Common Pleas, Family Court Division is affirmed.


By: Hoffman, P.J.
King, J. and
Gormley, J.  concur